Milligan, J.,
delivered the opinion of the Court.
This is a presentment for robbery. The prisoner is charged with taking from the person of one James 0. Tittsworth, various articles of personal property, among which, is one pistol, of the value of thirty dollars. The *131 cause was submitted to a jury of Jefferson County, which resulted in the conviction of the prisoner, as to the pistol, and an acquittal, as to all the other articles charged in the presentment. The Court pronounced judgment upon the verdict of the jury. A new trial was asked for, and refused; and an appeal in error prosecuted to this Court.
The proof shows, at the time of the commission of the offense charged in the presentment, the United States troops, then occupying a portion of East Tennessee, were at Hew Market, and the rebel forces a few miles distant above, in the vicinity of Panther Springs. The alleged robbery was committed on the 23d of December, 1863, between the two hostile forces. Titts-worth, upon whom the robbery is charged to have been committed, in substance, states, that he had been a soldier, in the service of the United States, about sixteen months, but had been recently, before that time, discharged. After his discharge, he had spent most of his time with, and in the rear of, the United States Army — had remained but very little at home. On the* day of his arrest, he had been with the Federal troops at Hew Market, and had left them only about one-half hour before his arrest. He had gone across from his residence to the stage-road, at Dr. Peck’s, above Hew Market; and after he had crossed the road, and was driving his cattle home, he saw a party of soldiers, which he at first supposed to be Federal troops, but, as they approached, he ascertained they were rebel soldiers. They immediately surrounded him, and presenting their guns, ordered him to surrender. The prisoner *132 was in the party, and presented his gun with others. He was ordered into line; and as he wheeled into the road, where the ^ body of the party were halted, one of the soldiers, Charles Inman, ordered him to take off his pistol, which was then belted around him. He did so3 and delivered it to Inman. The prisoner, at this time, was standing about five, or six paces from him, but said or did nothing.
Tittsworth further states, that at the time of his arrest, he had on a black jeans coat, with brass buttons, cut in military style, brown jeans pants, and a pistol belted around him. Both the prisoner and In-man knew him, as well as the fact that he had been in the army of the United States.
He told the party, before he surrendered his pistol, that he was a discharged soldier, but did not exhibit his written discharge, until he reached Mossy Creek. At this place, some of the party dismounted, and the prisoner lost some other 'articles of personal property; and afterwards, and during the day, his mule and money were taken; but the prisoner had no participation in these offenses. No other violence was offered to his person.
Under this state of proof, which substantially comprehends the controlling facts of the case, the Court was requested, in substance, to ■ instruct the jury: “That, if the prisoner belonged to the rebel army, and constituted a part of the scout that arrested and disarmed Tittsworth, under the usages of war, he had a right to do so, and he would not be guilty of any offense.”
*133 The Court refused so to charge the jury, but stated: “If the defendant was in arms, in open rebellion against the United States, and levying war, and was then acting as a rebel scout, he would, in law, be guilty of treason, the highest crime known to the laws of the land; and the act of being a rebel scout, would not exonerate him from the penalty of any unlawful act he might commit.
“In times of war, many things may be done for the purposes of war, which are not allowed in times of peace; but no laws of regular warfare, allow of robbery, in its legal sense.” * * ®
Other exceptions are taken to the charge, which, in the view we have taken of this case, we do not deem necessary to notice.
Robbery, by our Statute, (Code, • sec. 4631,) is defined to be, “the felonious and forcible taking from the person of another, goods or money of any value, by violence, or putting the person in fear,”
The language employed in the Code, is the same used in the description of this offense, in the Act of 1829, chap. 23, sec. 20. No difference is made in the two Statutes. The assault, or violence necessary to constitute robbery, under the Act of 1829, in the case of Smith vs. The State, 1 Hum., 394, was held to be an actual violence, or wrong done to the person; and in the case of Britt vs. The State, 7 Hum., 45, the Court say: “The fear constituting an element in this crime, is fear of present, personal peril, from violence offered or impending.-” The taking must be, by the terms of the Statute, felonious, and from *134 the person. It may be actually from the person, or in his presence only, as where a robber, by menaces or violence, puts a person in fear, and drives away his cattle, or takes his money, or other property, before his face. Robbery is a species of larceny, involving the same elements and turpitude, aggravated by taking from the person, by open violence, or putting in fear. The same design and malicious purpose, necessary in the one case, must be present in the other: 4 Blackstone’s Com., 241; Wharton’s Crim. Law, 629, also 640; 1 Russell on Crimes, 871; 1 Hale’s Plea of the Crown, 532. Hoes this case fall within the principles laid down? Was the taking by violence, or putting in fear, accompanied with a felonious intent, or animus furandi? We think not.
Pew, if any, of the elements necessary to constitute the crime of robbery, are present in this case. At the time of the alleged commission of this offense, the late cruel war was flagrant throughout the Southern States. Large armies on both sides, were martialed in hostile array against each other. The very ground upon which the alleged offense was committed, was disputed territory. The United States troops lay at New Market, and the rebel forces only a few miles above them. The prisoner was a rebel soldier, and then in the active service of the “Confederate Army,” and the party of which he constituted a member, had been, at the time of committing the offense charged, engaged in reconnoitering the front lines of the United States forces; and on their, return to their own camp, Tittsworth was discovered crossing the road in front *135 of the scout, dressed in clothing partially resembling the uniform of the United States soldiers, and armep with a pistol belted on his person.
Two of the rebel party, the prisoner and Charles Inman, recognized him, and. both knew the fact that he had been a soldier in the Federal army. He was surrounded, if not by the direct order, at least by the implied authority of the commander of the rebel “scout,” and at once, in the presence of the rebel officer, ordered to surrender. He promptly obeyed the order, and immediately claimed the protection due a discharged Federal soldier; but did not then exhibit his written discharge.
Re was immediately ordered into the ranks of the rebel soldiers, the body of whom was still standing in line in the road. There, upon the order of Charles Inman, he was disarmed, and surrendered his pistol into his hands. The prisoner at this time, was standing some five or six steps off, with the other soldiers, 'and said or did nothing.
Under this state of facts, we are unable to say the accused is guilty of robbery, in the technical and legal acceptation of the term. The felonious intent is certainly not made out, or the animus furandi established. Without the presence of these elements, there can be no robbery. The act itself was an act of war, and the property taken, contraband of war. Active hostilities existed at the time between the United States and the insurgents. The party in rebellion occupied and held, in a hostile manner, a large portion of the territory of the former — had declared their *136 independence, and were at the time, seeking to enforce it by the Bword. The rebel organization was so complete, and its armies so powerful, that the United States were constrained, by the dictates of common humanity, and the laws of civilized warfare, to acknowledge the contest a war, and the insurgents, under the laws of nations, entitled, in the conduct of the war, to the common rights of belligerents. The bonds of society and Government were for a time, broken, or at least their force and effect suspended, and the people separated into two distinct and hostile societies, each as belligerents, merely standing on the same level, and entitled, pending the contest, to the same rights of war as against each other, that they would have enjoyed had they both been independent sovereigns.
They could alike take prisoners, capture property belonging to each hostile party, and deal with combatants for the time, wherever the armies marched, as two sovereign and independent States: (Vattell’s Law of Nations, page 425, sec. 204.)
And such acts of hostility, when lawfully committed by one enemy, in the time of war, against another, are not punishable after the war is over, in the civil tribunals of the country. Lord Hale says, in his Pleas of the Crown, vol. 1, page 565: “The first is really true, when in tempus belli, within the kingdom, and one enemy either steals, robs or plunders tie house or goods of another; therefore, the book of 22 Assey, 95, adds to the definition of burglary times of peace; for in times of war, these kinds of offenses, committed by those of the same party, or those that are not in *137 hostility one to another, are fabulous. Yet, in time of war, when done by our enemy, they put on another name, as acts of hostility, misprison, and the like.”
This case, we think, falls within the above recited principle. And we are satisfied, notwithstanding Titts-worth’s discharge from the military service of the United States, that he was, at the time of his arrest, a combatant, in the sense of the laws of war, adhering to the Government of the United States, and virtually present with their armies, aiding and assisting them in the suppression of the rebellion, and, at the moment of his arrest, believed to be a soldier in the active service of the army.
Under such a state of facts, the “ scout,” under command of an officer of the opposing billigerent party, might, as an act of hostility, arrest and disarm him, with no other responsibility than attached under the laws of war.
In this view of the law of this case, we think the charge of the Circuit Judge, erroneous, and, under the facts of the case, well calculated to mislead the jury. It may be true the prisoner, by virtue of his connection with the rebel army, and his efforts, by levying war against the United States, to overthrow or dismember the Government thereof, was guilty of treason; and, if so, he could not shield himself from the punishment due that crime, under the laws of war, as a belligerent merely. Otherwise, treason, when committed by a large and powerful insurgent organization, however wicked the purposes, and diréct the effort might be> to overthrow, by arms, the Government, could not be *138 punished under the laws and Constitution of the United States.
The sovereign, in such a case, could not lawfully extend to the rebels, pardon and amnesty, after the war was over, which would confer any rights or immunities they did not previously enjoy under the laws of war.
Such, we apprehend, has not been the practice of any civilized nation on earth, and such an interpretation of the rights of belligerents merely, we think is no where to be found in the books of international law.
There is a well defined distinction between belligerents merely, and belligerent States. The former can exercise the rights of war only, while the latter can exercise both sovereign and belligerent .rights: Rose vs. Heinely, 4 Cranch, 87. The fact that the rebels, pending the war, were recognized as belligerents, by no means concedes to them the rights of sovereignty, either absolute or de facto; and, after the war terminated, they may be arraigned and tried under, the municipal authority, for treason, or pardoned and forgiven by the sovereign power. But, the crime of treason is wholly different from the offense with which the prisoner stands charged in this presentment; and the making out the one, as seems to be implied in the charge of the Circuit Judge, does not necessarily establish the other. The latter part of the instructions to the jury, as hereinbefore set out, to say nothing of other exceptions that are taken to the' charge, is objectionable, and well calculated to mislead the jury. The Court stated: “ In times of war, many things may be *139 done, for the purposes of tbe war, which are not allowed in times of peace, but no law of regular warfare allows of robbery in its legal sense.”
The language indirectly assumes the guilt of the prisoner, and cuts him off from the benefit of every right which he certainly had under the laws of war, that might excuse or extenuate his crime.
The judgment of the Court must be reversed, and a new trial awarded, when the law will be declared according to this opinion.